719 So.2d 546 (1998)
STATE of Louisiana
v.
Fred HANKTON, Jr.
No. 96-KA-1538.
Court of Appeal of Louisiana, Fourth Circuit.
September 16, 1998.
*547 Archie B. Creech, Orleans Indigent Defender Program, New Orleans, for Defendant/Appellant.
Harry F. Connick, District Attorney of Orleans Parish, Susan Erlanger Talbot, Assistant District Attorney of Orleans Parish, New Orleans, for State/Appellee.
Before SCHOTT, C.J., and JONES and WALTZER, JJ.
WALTZER, Judge.

STATEMENT OF THE CASE
Fred Hankton, Jr. was charged, along with Kerry Lacy, by grand jury indictment with first degree murder. He was arraigned, pled not guilty and filed motions to suppress a statement and an identification which were denied. His trial was severed from that of his co-defendant that date. A twelve member jury found him guilty of second degree murder, a violation of La. R.S. 14:30.1, on 2 May 1996. He was sentenced on 9 May 1996 to life imprisonment at hard labor without benefit of parole, probation of suspension of sentence. He appeals his conviction and sentence.

STATEMENT OF FACTS
Luciana "Shannon" Beard testified that on 8 June 1995, she had been living with the victim, John Stevenson, at 2118 Clio Street, Apartment 4A for about a month. At 11:00 p.m., she heard fumbling at the back door. She unlocked the door, which then flew open. Fred, whom she later identified as the defendant Fred Hankton, and a man whom she knew as "Lacy" came into the apartment. Hankton had Stevenson by the neck and was choking him. Lacy pulled out a gun, ordered Stevenson and Beard to lie down on the floor, and Hankton then asked Stevenson, "Where it's at?", whereupon Stevenson directed him to a shelf in another room. Hankton began looking around the house. He came back into the room at one point, and Beard saw him putting a tin foil packet in his pocket. He then began asking for money. Beard and Hankton went into the other room to get the money. After she gave him the money that was kept in that room, he asked Stevenson where the remainder was located. Stevenson directed Beard to a rice bag in the kitchen where she found a white object which she gave to Hankton. Stevenson and Lacy began arguing. Stevenson asked Lacy not to kill him in front of Beard. Then Lacy emptied the gun into Stevenson and Hankton told Beard she had better not tell anyone what happened. Beard called to Stevenson, and, having received no response, jumped over her year old daughter and called out of the window for help. She grabbed the baby and ran downstairs where a man had already called for the police and she spoke to the police operator. When the police arrived at the scene, she told Detective Deal that Lacy lived at an address on Thalia Street. She testified that she was uncomfortable talking to the police at the scene. A few days later, she identified both men in photographic lineups. She repeatedly testified that she recognized Hankton's photo as a picture of the man who had held Stevenson around the neck, and said that Detective Deal did not use force, threat, coercion, promise or suggestion in any way to lead her to make the identification. She also made an in-court identification of Hankton.
*548 Officer Ernest Joseph testified that he responded to the gunshot call and found the victim lying face down in a pool of blood. He spoke to Ms. Beard and tried to calm her, and secured the crime scene.
Officer Jake Schnapp arrested both Hankton and Lacy on 19 June 1995, outside 2319 Thalia Street.
Dr. Paul McGarry, qualified as an expert in forensic pathology, testified that Stevenson's death was caused by multiple gunshot wounds. One shot to the head and one to the heart had penetrated his body deeply. One shot to the head had been fired at close range.
Detective Dwight Deal of the New Orleans Police Department's Homicide Division testified that he arrived at the scene in response to the 911 call and spoke to Beard, whom he described as cooperative but frightened, shaken and scared. She gave extensive descriptions of the suspects and said that she knew Lacy by name but was afraid that if she told, the killers would be able to trace the information back to her. She said that she knew the name of a man with whom he lived, Troyell "Turkey" Ross, on Thalia Street. Deal obtained a picture of Ross, whose registered address was 2319 Thalia Street, Apartment D, and Beard said that he was indeed the man who lived with Lacy. Two days later, Deal compiled two photographic lineups, one containing a picture of Lacy, and one containing a picture of Hankton. On 12 June he showed Beard the pictures and asked only if she recognized anyone in either or both sets of pictures. Beard immediately chose Hankton and Lacy, and wrote on the back of each photo a description of that person's part in the crime. Detective Deal confirmed Beard's testimony that he did not force, threaten or coerce her to make an identification, did not promise her anything, tell her she had to pick someone or suggest whom she should pick. He applied for and obtained arrest warrants for the two men.
After Hankton's arrest on 19 June 1995, Deal advised him of his rights and had him sign a rights of arrestee form. Hankton made a statement that was transcribed and recorded. The tape was played for the jury, and a copy of the transcript was provided to each of them. In the statement, Hankton said that he and Lacy had gone to the Stevenson's apartment the night of the murder to take Stevenson's dope. He grabbed Stevenson around the neck and Lacy had drawn a black .357 handgun on Stevenson. He and Lacy made him lie on the floor. A girl in the house showed Hankton where the drugs were, he took the drugs, including heroin from a rice bag, and money, and Lacy shot Stevenson. He confirmed that there was a baby in the house at the time of the murder.
Kendra Spencer, Hankton's seventeen year old girlfriend, a junior at Joseph S. Clark high school, testified that she was with him all night on the night of the crime. At one point, after midnight, they left his mother's house on the west bank and drove to a daiquiri shop at the corner of St. Charles and Carrollton Avenues, in the uptown section of New Orleans, where they bought daiquiris. She remembered the night because she testified that it was the night she lost her virginity. She said 8 June 1995, was either a Saturday or a Sunday. It was, in fact, a Thursday. Scott Sorenson, manager of the daiquiri shop, testified that the store always closed at midnight on Thursdays. He produced a tape from the register that showed that the store did in fact close at midnight on 8 June 1995.

ERRORS PATENT
We have examined the entire record for errors patent and have found none.
FIRST ASSIGNMENT OF ERROR: The lack of a transcript of the hearing on Hankton's Motion to Suppress Evidence denied him his right to appellate review based upon a complete record.
The transcript having been provided and a supplemental brief having been filed on Hankton's behalf based upon the transcript, this assignment of error is moot.
SECOND ASSIGNMENT OF ERROR TWO: The trial court erred in allowing gruesome photographs into evidence.
At the trial, the State introduced into evidence photographs of the victim at the scene. The defense objected that they were gruesome and inadmissible. The trial court admitted the photographs, and Hankton now *549 complains that in so doing, the trial court erred.
The admission of gruesome photographs will not be overturned unless it is clear the prejudicial effect of the photographs outweighs their probative value. State v. Lindsey, 543 So.2d 886, 894-95 (La. 1989), certiorari denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990); State v. Bourque, 622 So.2d 198, 236 (La.1993), reversed on other unrelated grounds, State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16, 21. The fact that the photographs are gruesome does not, in and of itself, prevent their admissibility. State v. Comeaux, 514 So.2d 84, 97 (La.1987).
Post-mortem photographs at the scene or autopsy photographs of murder victims are admissible to prove corpus delicti, to provide positive identification of the victim and to corroborate other evidence establishing the cause of death, the manner in which death occurred, and the location, severity, and number of wounds. State v. Copeland, 530 So.2d 526, 543 (La.1988), cert. denied, Copeland v. Louisiana, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989). The defendant cannot deprive the State of the moral force of its case by offering to stipulate to what is shown in photographs. State v. Perry, 502 So.2d 543, 559 (La.1986), cert. denied, Perry v. Louisiana, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987).
In Bourque, the Supreme Court found the photographic evidence offered was relevant and probative in proving the state's case against the defendant. La. C.E. art. 403. The court noted that "although the autopsy photographs of the victim were graphic, they helped establish the cause of death and the victim's attempt to defend herself." Bourque, 622 So.2d at 236. The photographs of the victim at the scene corroborated the testimony of law enforcement officers as to the location of spent shell casings, the location of the victim, and the manner in which she died.
In the present case, the photographs show the location and the severity of the wounds. In addition, they show that the victim was made to lie on the floor as Beard testified. These photographs were of significant probative value, and any prejudicial effect due to the gruesome nature of the photographs did not outweigh the probative value. The trial court did not err when it allowed the state to introduce these photographs into evidence. This assignment of error is without merit.
THIRD ASSIGNMENT OF ERROR: The trial court erred in allowing Detective Dwight Deal to testify as to hearsay.
Beard testified that she was still "scared and shaky" when Deal arrived at the scene, and that she did not feel comfortable talking to him. He asked her for a description of the perpetrators, and she gave a detailed physical description of the men and the clothes they were wearing. She said that she did not tell Deal at first that she knew either of the men, but later told him that she knew the one with the gun was "Lacy", that she knew where he lived, and that she knew that Ross lived with him.
On cross-examination, defense counsel asked her about her initial description of Hankton. He then asked her about her identification of him in the photographic lineup and whether she had known him before the night of the crime. She said when asked by Deal the day after the crime whether she knew "Fred Hankton", that she was not sure, although the name sounded familiar, that she knew relatives on his father's side of the family, and that she had seen him when she was younger, perhaps ten or twelve years old.
Deal then testified that when he first began interviewing Beard, she was cooperative but appeared very frightened. He said he could tell "There was something I wasn't necessarily getting at that point." The prosecutor then asked, "What was it she initially told you?" The defense objected on the ground of hearsay. The prosecutor then argued that Beard had already testified, and that the evidence was being presented not for the truth of the matter asserted, but to corroborate Beard's testimony and establish her credibility. Deal then testified that Beard had acted exactly as she had testified. First, she gave a description of the men, then later in the interview she said that she knew *550 one of them. She explained that she had not wanted to tell him that she knew Lacy because she was afraid that the men would find out and harm her.
The defense now argues that because defense counsel did not cross-examine Beard as to why she had not originally told Deal that she knew Lacy, Deal's testimony was hearsay.
The evidence was apparently admitted to prove that Beard's testimony was consistent with her prior statement on the night of the crime. Article 801(D)(1)(b) of the Code of Evidence provides that prior consistent statements of a witness are admissible "to rebut an express or implied charge against him of recent fabrication or improper influence or motive." Such statements are not hearsay. Recently, the Louisiana Supreme Court interpreted the article. In State v. Langley, 95-1489 (La.4/14/98), 711 So.2d 651, the defense tried to impeach a witness by noting that the witness had not testified to the complete statement at the pre-trial hearing, and had added a critical element to his trial testimony, i.e. that the defendant had stated that if he got out of jail, he would commit the same crime. The Court ruled that once the defendant suggested on cross-examination that the statement had been recently fabricated, he opened the door to the rehabilitation of the witness's testimony with the prior consistent statement of the district attorney, which was made either at the trial or the pre-trial hearing.
In this case, because defense counsel did not cross-examine Beard as to why she had not originally told Deal that she knew Lacy, Deal's testimony was hearsay. The defense did not suggest on cross-examination that Beard's statement at trial had been recently fabricated. Thus unlike in Langley, Hankton did not open the door to the rehabilitation of Beard's testimony. Deal's testimony was therefore hearsay, and the trial court erred in overruling the objection.
However, pursuant to La.C.Cr.P. art. 921, a judgment or ruling shall not be reversed because of any error which does not affect substantial rights of the accused. The key inquiry is whether there is a reasonable possibility that the admission or exclusion of certain evidence, depending on the case, might have contributed to the conviction. The reviewing court must be able to conclude that the error was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); State v. Hearold, 603 So.2d 731 (La.1992). In this case, Deal's testimony was merely cumulative of Beard's. Furthermore, there was overwhelming other credible evidence of Hankton's guilt. Beard was sure of her identification, and Hankton's confession establishes that he had gone to the apartment to rob the victim of drugs and money. The error was therefore harmless. This assignment of error is without merit.
SUPPLEMENTAL ASSIGNMENT OF ERROR: The trial court erred in denying Hankton's Motion to Suppress Identification.
A defendant has the burden of proving that the identification was suggestive and, if so, that the suggestive procedure gave rise to a substantial likelihood of irreparable misidentification. Reliability is the linchpin in determining whether an out-of-court identification is admissible at trial. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). In Manson, the United States Supreme Court set forth the following factors to be considered in determining whether the out-of-court identification is reliable: (1) the witness' opportunity to view the defendant at the time the crime was committed; (2) the degree of attention paid by the witness during the commission of the crime; (3) the accuracy of any prior descriptions of the perpetrators; (4) the level of the witness' certainty displayed at the time of the identification; and (5) the length of time elapsed between the crime and the identification.
At the motion hearing, Deal testified that Beard "immediately and positively" identified Hankton when he showed her the photographic lineup. She was "absolutely positive." He and Beard testified that he in no way suggested that she chose Hankton's picture, nor did he coerce her, promise her anything or suggest which picture she should choose. Beard testified that she was positive *551 of her identification. On cross-examination, she testified that she knew Lacy, and that Deal asked her whether she knew "Fred Hankton" because he had gotten a call implicating him. She said Deal told her that he had suspects. She said, as to whether or not she knew Hankton, that when she was small, she used to live across the street from Hankton's family. In response to a question of whether Deal told her Hankton's picture was in the lineup, she said, "I had overlooked the second picture, and the detective told mehe saidI couldn't say. I say, `I don't know.' Then he say, `You better make sure and see if that's the right one,' and then he said, `Fred, he's in the picture.'" On re-direct examination, she said that she had not recognized the man in her house as "Fred Hankton," but that she had chosen his picture because he was in fact the man who had been in her house and who had grabbed Stevenson around the neck. Beard was cross-examined at trial as to her having made this statement. She said, "Before hebefore I was asking him any questions about Fred, I picked out the picture. I just jumped to No. 2 picture, and he told me he said, `Hold up.' He said, `Are you sure that's the one you saw?' I said yes." Then she testified, "Your honor, I had said it because I came in here and testified that day. And I was trying to watch Lacy. And he was making eye contact at someone in the audience. And I'm watching him and trying to answer your questions, and I just got all mixed up and confused and stuff." On re-direct examination, she said that she had not seen Hankton for seven years, since she was twelve years old, and that she did not know that the picture she chose was a picture of Fred Hankton.
Applying the Manson factors, Beard had the opportunity to view Hankton close-up at the time the crime was committed. Her degree of attention during the commission of the crime was necessarily great; Lacy was holding a gun to her boyfriend, and Hankton was following her around the house as she collected the drugs and money. Her prior descriptions of Hankton were accurate. She was very certain at the time of the identification. She made the identification only three days after the crime was committed. Under Manson, the identification was reliable.
Although there was some confusion as to whether Deal told Beard that Hankton was a suspect before she chose his picture, she clearly stated repeatedly that she had chosen the picture because it was a picture of the man who had been in her house the night of the crime, and not because it was a picture of Fred Hankton. Much time had elapsed since Beard's childhood when she had seen him. There was no evidence that Beard knew what "Fred Hankton" looked like when she chose his picture. This assignment is without merit.

CONCLUSION AND DECREE
Having found no errors patent on the record, and having found no merit in the assignments and supplemental assignment of error, we affirm the conviction and sentence of Fred Hankton, Jr.
CONVICTION AND SENTENCE AFFIRMED.