750 So.2d 343 (1999)
STATE of Louisiana
v.
Samuel GREEN.
No. 98-KA-1021.
Court of Appeal of Louisiana, Fourth Circuit.
December 22, 1999.
*344 Harry F. Connick, District Attorney, Holli Herrle-Castillo, Assistant District Attorney, New Orleans, Counsel For Plaintiff-Appellee State Of Louisiana.
Louisiana Appellate Project, Yvonne Chalker, New Orleans, Counsel For Defendant-Appellant Samuel Green.
Court composed of Chief Judge ROBERT J. KLEES, Judge JOAN BERNARD ARMSTRONG, Judge MICHAEL E. KIRBY.
KLEES, Chief Judge.
On January 25, 1996, the defendant, Samuel Green, was indicted for the second degree murder of Newman Brown. The defendant entered a plea of not guilty at his arraignment on March 1, 1996. A discovery and suppression hearing was held on April 12, 1996. The trial court found probable cause, granted defendant's motion to suppress statement and denied defendant's motion to suppress identification. The State objected to the trial court's granting of defendant's motion to suppress statement and sought supervisory review. This Court granted the writ application, reversed the trial court's ruling and remanded the matter. State v. Samuel Green, 96-0969 (La.App. 4 Cir. 9/25/96), 681 So.2d 469, writ denied, 96-2610 (La.6/20/97), 695 So.2d 1348. The defendant was found guilty as charged after a jury trial on October 23, 1997. At the sentencing hearing on October 30, 1997, the trial court sentenced the defendant to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence.

STATEMENT OF FACTS
Fernell McCray and Newman Brown were friends for six to seven months. On August 15, 1995, McCray and his girlfriend had an argument near her house in the 1900 block of Dorgenois. A black male unknown to McCray intervened in the argument. McCray and the man got into a fistfight. After the fight was over, McCray went home. Later that evening, he met Newman Brown and Norman Jones at a Subway shop. They spent a half hour at the Subway shop and then decided to go to Club Rumors. When the men arrived at the club, they were told they could not enter the lounge with alcoholic beverages not purchased at the lounge. They stood outside the front of *345 the lounge drinking the beer they had bought at Subway. The security guards told them they had to move from the front of the lounge. The men then walked towards a dumpster near the rear of the lounge. As they passed the side door of the lounge, McCray saw the guy he had fought with earlier in the day and told his friends about the fight. The guy and the defendant saw McCray and approached him. A fight ensued among the men. Jones hit the defendant in the mouth and busted his lip. The security guards broke up the fight. McCray and his two friends stayed at the lounge and spoke with the security guards. The other two men left. Later, McCray, Brown and Jones walked to a nearby Shell Station and bought more beer. They walked back to the lounge and drank their beer while standing near the pay telephone. Shortly thereafter, the defendant drove a red Chevrolet into the lounge parking lot. The defendant got of the car, walked to the trunk, took an assault rifle out of the trunk and started shooting. Brown ran towards his car, which was parked in the parking lot, while McCray and Jones ran towards the front door of the lounge. McCray and Jones continued running towards a Western Union store on the next corner. They stayed there until the gunfire stopped. After the gunfire, they heard an explosion. McCray and Jones were on their way home when they saw a police car. They flagged down the vehicle. The officer asked them if they knew anything about what happened at Club Rumors. They said yes. The officer then told them that Brown had been killed. McCray and Jones got into the police vehicle and returned to Club Rumors. McCray and Jones gave statements about the incident to Detective Catalanotto. McCray also tentatively identified the defendant in a photographic lineup as the perpetrator. McCray and Jones positively identified the defendant at trial as the perpetrator. McCray acknowledged prior convictions for possession of marijuana and possession of an unregistered firearm.
Officer Michael Crawford responded to a call of a shooting at approximately 2:30 a.m. on August 16, 1995 at Club Rumors on St. Claude Avenue. When he arrived on the scene, there was a fire truck, an emergency medical unit and two other police units on the scene. The emergency medical unit was tending to the victim. There was a red Chevrolet parked adjacent to the victim's vehicle. The victim's vehicle and two other vehicles had bullet holes in them. There were rifle casings in several locations in the parking lot. The officer observed a blood stained white tee shirt in the red Chevrolet.
Dr. William Newman, a forensic pathologist, performed an autopsy on the victim. Upon examination, the physician observed that the victim had eleven gunshot wounds. There were three gunshot wounds to the right upper leg, three gunshot wounds to the right lower leg, one gunshot wound to the left upper leg, one gunshot wound to the right chin, one gunshot wound to the right back shoulder, a superficial gunshot wound to the right buttock and a superficial gunshot wound to the right shoulder. The gunshot wound to the right back shoulder caused the most severe injuries to the chest and lungs. This injury caused extensive bleeding into the chest. The loss of blood was the immediate mechanism of death. Testing of the victim's blood and urine revealed an alcohol level of .02.
Marilyn Brown, the victim's mother, last saw her son on August 15, 1995. The victim was eighteen years old and had just graduated from Warren Easton High School.
Officer James Gahagan, a crime lab technician, processed the crime scene at 2831 St. Claude Avenue on August 16, 1995. The officer photographed the scene and collected evidence, including rifle casings and clothing. Six AK-47 rifle casings and two live cartridges were recovered from the scene. A blood stained white tee shirt was found on the floorboard of the red Chevrolet. The officer also collected *346 the victim's clothing which had been cut off of the victim by the emergency medical technicians.
Officer Ted Fambro, a crime lab technician, processed the two vehicles on the crime scene. The gray vehicle was burnt. The officer collected blood samples and one rifle casing from the gray vehicle. Four blood samples were taken from the red vehicle. The officer also dusted the red vehicle for fingerprints. He obtained twenty partial fingerprints from the vehicle. Officer Raymond Loosemore, an expert in the identification and analysis of fingerprints, was able to identify three of the prints as those of a David Thomas. None of the fingerprints was matched to the defendant.
Officer Theresa Lamb, a criminalist with the Crime Lab, examined the blood samples taken from the white tee shirt and the vehicles. The blood on the white tee shirt was identified as Group O human blood. The blood sample taken from the driver's side door of the gray vehicle was identified as Group O human blood. A blood sample taken from the fabric of the passenger seat of the red vehicle was identified as Group AB human blood. A blood sample taken from the plastic trim on the floor near the driver's side door of the red vehicle was identified as Group O human blood. The officer was not able to type the other blood samples. Officer Keith Barker, a forensic scientist with the New Orleans Police Department, examined blood taken from the defendant and determined that the defendant had Group O blood.
Officer Byron Winbush, a firearms examiner with the Crime Lab, examined the casings found on the scene. The officer testified that an AK-47 or SKS, both assault rifles, could have fired the bullets found on the scene. Officer Timothy Suzeneau, a forensic light examiner with the Crime Lab, examined the casings and cartridges for possible fingerprints. No fingerprints were found on the casings and cartridges.
Officer Louis Gebler of the Madison, Wisconsin Police Department participated in the defendant's arrest. On December 11, 1995, information was received by the Madison Police Department that the defendant was currently working at a J.C. Penney store on the east side of town. Officer Gebler contacted J.C. Penney's to confirm that the defendant was employed there. The officer learned that the defendant was employed there but was off that day. The defendant would be at work the next day. The next day, December 12, 1995, the loss risk manager at J.C.Penney called and said that the defendant was working. Officers Gebler and Lahr and two other officers went to the store and met with the manager. The manager called the defendant into an office. The police officers identified themselves and arrested the defendant. The defendant was not advised of his rights at this time. The defendant was then transported to the police station. The defendant was taken into an interview room with Officer Lahr while Officer Gebler contacted Detective Catalanotto. Officer Lahr was in the interview room with the defendant for approximately forty-five minutes. After speaking with Detective Catalanotto, Officer Gebler went into the interview room. He asked the defendant if he wanted to talk to them. The defendant said yes and the officer advised the defendant of his rights. The defendant stated that he understood his rights. The defendant then told the officers that he wanted to talk to the officers but he also wanted an attorney. The defendant asked Officer Gebler if the police officer in New Orleans told him that the defendant had been beaten up in a fight in New Orleans, a car blew up and the guy was living when he left. The defendant reiterated that he wanted to talk to the officers but also wanted an attorney. Officer Gebler told the defendant that once an attorney was obtained for him, the defendant would not be able to speak with the officers. The defendant was then allowed to call his grandmother, and she advised the defendant to wait for *347 an attorney. The officers did not question the defendant and prepared to transport him to New Orleans.
Officer William Lahr, of the Madison, Wisconsin Police Department, assisted in the defendant's arrest. He transported the defendant from J.C.Penney to the police station. The officer did not advise the defendant of his rights upon arrest. When they arrived at the police station, the defendant was taken into an interview room. The defendant's handcuffs were removed and he was offered whatever he needed. The defendant's request for a glass of water was granted. While Officer Gebler called New Orleans, Officer Lahr stayed in the interview room with the defendant and proceeded to fill out the booking forms. When Officer Lahr asked the defendant if he had any identifying marks, the defendant did not respond. The defendant rubbed his teeth with his finger and stated that something happened to his teeth in New Orleans and he wanted to wait to talk about it until the other officer returned. After the booking forms were completed, Officer Lahr and the defendant sat in the interview room waiting for Officer Gebler. The defendant appeared to be getting a little nervous while waiting for Officer Gebler. The defendant told Officer Lahr that he was out with some friends in New Orleans when he and his friends were beaten up. The defendant had four lower teeth knocked out. His friends had guns and started shooting. He heard a car explosion. When he left, the guy was still alive. Shortly after the defendant made that statement, Officer Gebler came into the room. Officer Gebler advised the defendant of his rights. The defendant indicated that he understood his rights. The defendant then told the officers that he wanted to talk to the officers but he also wanted an attorney. The defendant asked Officer Gebler if the police officer in New Orleans told him that the defendant had been beaten up in a fight in New Orleans, a car blew up and the guy was living when he left. The defendant reiterated that he wanted to talk to the officers but also wanted an attorney. Officer Gebler told the defendant that once an attorney was obtained for him, the defendant would not be able to speak with the officers. The defendant was then allowed to call his grandmother, and she advised the defendant to wait for an attorney. The officers did not question the defendant and prepared to transport him to New Orleans.
Detective Joseph Catalanotto, a homicide detective with the New Orleans Police Department, was the lead investigator in the case. When Detective Catalanotto arrived on the scene, the victim had already been taken to Charity Hospital and was in critical condition. The incident had occurred in Club Rumors' parking lot. The victim's vehicle, a 1997 gray Chevrolet Impala, was severely burned. The passenger side was riddled with bullet holes. The other vehicle, a red Chevrolet Cavalier, was facing the Impala. There was a blood stained tee shirt in the vehicle. Several droplets of blood were found in the interior of the vehicle. Two other vehicles in the parking lot were also struck by bullets. Later that evening, the officer was approached by Dion Dennis who sought to pick up the vehicle. Detective Catalanotto informed her that she could not take the vehicle as there was blood in the vehicle and they were still processing the vehicle. Detective Catalanotto asked Ms. Dennis if she knew who was driving the vehicle. The officer thought, at that time, that he had a second victim. Officer Catalanotto also met with Norman Jones and Fernell McCray. McCray tentatively identified the defendant in a photographic lineup as the perpetrator. Six rifle casings and two live cartridges were found on the scene. The victim's clothing was also retrieved.
On December 12, 1995, Officer Catalanotto received a phone call from Officer Gebler who informed him that they had the defendant in custody. He asked Officer Gebler to question the defendant if the defendant was willing. The defendant was later extradited to New Orleans.

*348 DISCUSSION

A. Errors Patent
A review of the record for errors patent reveals none.

B. Assignment of Error Number 1
In his first assignment of error, the defendant contends that the arrest warrant was issued without probable cause and as such, the fruits of the defendant's illegal arrest, i.e., his statements, should have been suppressed. The defendant admits in his brief that his trial counsel did not move to suppress the statements based on an invalid arrest warrant prior to trial. Normally such a failure to move to suppress would preclude review of the merits on appeal. See La.C.Cr.P. article 703. However, we will consider the merits as the defendant has alleged in assignment of error number four that his trial counsel was ineffective for failing to file a motion to suppress based on an invalid arrest warrant.
The Louisiana Supreme Court in State v. Simms, 571 So.2d 145, 148 (La.1990), noted the following:
Probable cause to arrest exists when the facts and circumstances within the officer's knowledge are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime. Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); State v. Wilson, 467 So.2d 503 (La.1985). The determination of probable cause, although requiring something more than bare suspicion, does not require evidence sufficient to support a conviction. Probable cause, as the very name implies, deals with probabilities. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). The determination of probable cause, unlike the determination of guilt at trial, does not require the fine resolution of conflicting evidence that a reasonable doubt or even a preponderance standard demands, and credibility determinations are seldom crucial in deciding whether the available evidence supports a reasonable belief that the person to be arrested has committed a crime. Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); State v. Rodrigue, 437 So.2d 830 (La.1983). The determination of probable cause involves factual and practical considerations of everyday life on which average men, and particularly average police officers, can be expected to act. State v. Ogden and Geraghty, 391 So.2d 434 (La.1980).
La.C.Cr.P. art. 202 provides that a warrant of arrest shall be issued when the person making the complaint executes an affidavit specifying, to his best knowledge and belief, the nature, date, and place of the offense, and the name and surname of the offender if known, and of the person injured if there be any; and the magistrate has probable cause to believe that an offense was committed and that the person against whom the complaint was made committed it.
In the affidavit filed in support of the arrest warrant, Detective Catalanotto stated:
On Wednesday, August 16, 1995 at approximately 2:40AM Newman Brown was fatally wounded as he sat in his vehicle that was parked in the parking lot of Club Rumors located at 2831 St. Claude Avenue. Newman was shot multiple times with a large caliber semi automatic rifle in the legs, neck and face.
While conducting his scene investigation, Detective Catalanotto observed a second vehicle that is described as a Red Chevrolet Cavalier, two door, parked approximately fifteen feet from the victim's vehicle. While examining the vehicle and it (sic) relation to the incident described above, Detective Catalanotto noticed fresh blood stains on the front seat and on a white t-shirt that rested on the center console as well as on the rear door jam and the rear bumper.
At this point in the investigation it was undetermined if the Chevrolet Cavalier *349 was a second victim's vehicle or a suspect vehicle.
While on the scene, Detective Catalanotto was approached by a Negro female who identified herself as Dion Dennis. Ms. Dennis stated that she was the owner of the Red Chevrolet Cavalier. Ms. Dennis also stated that her brother, Samuel Green, was driving her vehicle the entire night.
In continuing his on scene investigation, Detective Catalanotto located two witnesses to the incident. It was at this point that it was confirmed that the suspect who shot and killed Newman Brown drove up to the scene in the red Chevrolet Cavalier, exited his vehicle, opened the trunk of the vehicle, removed a large caliber semi automatic rifle from the trunk and opened fire on the vehicle in which Brown was seated.
With the information provided by Ms. Dennis and the information obtained from the two known witnesses, Detective Catalanotto prepared a photo lineup with one of the photographs depicting Samuel Green.
The photo spread was presented to the known witnesses. One of the witnesses tentatively identified Samuel Green as the perpetrator.
In the present case, the affidavit supplied by Detective Catalanotto sets forth sufficient facts for the magistrate to find probable cause to arrest the defendant for second degree murder. The affidavit states that the victim was killed as a result of multiple gunshot wounds. The one of the witnesses tentatively identified the defendant as the perpetrator. The witness stated that the perpetrator got of the red Chevrolet, opened the trunk, took an assault rifle out of the trunk and started shooting. The witness' tentative identification is supported by the statement of Dion Dennis. Ms. Dennis informed Detective Catalanotto that the red Chevrolet was hers and she had lent it to her brother, the defendant, that evening. Such information provided the magistrate with probable cause to believe that the defendant had killed the victim.
This assignment is without merit.

C. Assignment of Error Number 2
The defendant further argues that the statements the defendant made to Officers Gebler and Lahr were not voluntary and should have been suppressed. The statements were made by the defendant prior to the officers advising the defendant of his rights against self-incrimination and to counsel.
This issue was addressed by this Court in a writ application taken by the State after the trial court granted the defendant's motion to suppress the statements. This Court reversed the trial court's ruling and held that the statements were admissible. In so holding, this Court stated:
A voluntary, spontaneous statement is admissible without Miranda warnings, even if the defendant is in custody when the statement is made. State v. Lee, 95-1398, p. 2 (La.App. 4 Cir. 8/23/95), 660 So.2d 911. In the present case none of the statements suppressed by the trial court were in response to any questioning about the murder. The defendant's first statements were unresponsive to the general questions the officers were asking the defendant while booking him. See State v. Poche, 524 So.2d 189 (La. App. 4 Cir.1988). The defendant's statements were not the product of an interrogation but rather were the defendant's spontaneous admissions. The officers' failure to advise the defendant of his rights at the time he first began making his statements did not render the statements involuntary.

State v. Green, 96-0969, pp. 2-3 (La. App. 4th Cir. 9/25/96), 681 So.2d 469, 470, writ denied, 96-2610 (La.6/20/97), 695 So.2d 1348.
Accordingly, this assignment is without merit.

*350 D. Assignment of Error Number 3

The defendant also contends that the in-court identifications were unreliable and should not have been admissible. In the alternative, the defendant suggests that the identifications were not sufficient to prove, beyond a reasonable doubt, that the defendant was the perpetrator. Defendant did not object to the witnesses' identifications of the defendant at trial. Such a failure to object would preclude review of the alleged error on appeal. See La. C.Cr.P. article 841. However, as defendant argues on appeal that his trial counsel was ineffective in failing to object to the identifications, this issue will be discussed.
To suppress identification, a defendant must prove that the identification itself was suggestive and that there was a substantial likelihood of misidentification as a result of the identification procedure. State v. Nogess, 98-0670, (La.App. 4 Cir. 3/3/99), 729 So.2d 132; State v. Hankton, 96-1538, (La.App. 4 Cir. 9/16/98), 719 So.2d 546, writ denied, 98-2624 (La.1/29/99), 736 So.2d 828. If the identification procedure is found to have been suggestive, the court must then determine whether there was a substantial likelihood of misidentification by looking to the five factors enunciated in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), as adopted by the Louisiana Supreme Court in State v. Prudholm, 446 So.2d 729, 738 (La.1984): (1) the witness's opportunity to view the defendant at the time the crime was committed; (2) the degree of attention paid by the witness during the commission of the crime; (3) the accuracy of any prior description; (4) the level of the witness's certainty displayed at the time of identification; and (5) the length of time elapsed between the crime and the identification. Hankton, 96-1538, at pp. 8-9, 719 So.2d at 550. The trial court's determination on the admissibility of identification evidence is entitled to great weight and will not be disturbed on appeal in the absence of an abuse of discretion. Nogess, id.
Both witnesses positively identified the defendant at trial as the perpetrator. The defendant suggests that their identifications were suggestive because the State allowed the witnesses to view photographs of the defendant prior to trial. Mr. McCray and Mr. Jones testified that the State showed them the photographic lineup from which defendant was selected approximately three to four times over two year period. Such actions were not suggestive but only part of the trial preparation. Mr. McCray had tentatively identified the defendant in the photographic lineup as the perpetrator. While Jones did not identify the defendant in the photographic lineup, Jones testified at trial that he was positive of his identification. Jones stated that he did not identify the defendant in the photographic lineup because the photographs were of juveniles. Apparently, the police only had a juvenile photograph of the defendant and used that photograph of the defendant in the photographic lineup.
However, if even such procedure was suggestive, the witnesses' identifications were reliable. Both witnesses were positive about their identification of the defendant. The witnesses testified that they were in a physical altercation with the defendant prior to the shooting. Mr. Jones admitted that he threw the first punch and struck the defendant in the mouth. Mr. McCray and Mr. Jones testified that they saw the defendant face to face during the fight. Defendant and his friend left the lounge after the fight. However, the defendant returned approximately fifteen to twenty minutes later in a red Chevrolet. The witnesses were still at the lounge when the defendant returned. The witnesses were standing in front of the lounge when they saw the defendant pull into the lounge parking lot. The trial court did not err in finding the identification reliable and allowing the identifications into evidence.
*351 The defendant further argues that the identifications were not sufficient to prove beyond a reasonable doubt that he was the person who shot and killed Newman Brown.
When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. La. R.S. 15:438 is not a separate test from Jackson v. Virginia, supra, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, supra.
In the present case, McCray and Jones identified the defendant at trial as the person who they saw exit the vehicle, open the trunk, pull out the weapon and start shooting in their direction. McCray and Jones had previously been involved in an altercation with the defendant several minutes before the shooting. McCray testified that the defendant approached him and was "in his face." Jones admitted that he was the person who struck the defendant in the face and busted his mouth. Both men had close up views of the defendant. Their identifications of the defendant as the perpetrator were sufficient to prove the defendant's identity as the perpetrator beyond a reasonable doubt.
This assignment is without merit.

E. Assignment of Error Number 4

In this assignment, the defendant contends that he received ineffective assistance of counsel at trial. The defendant suggests that his trial counsel made no effort to challenge the arrest warrant, failed to challenge the in-court identifications and failed to cross examine McCray and Jones about their inconsistent statements.
Generally, the issue of ineffective assistance of counsel is a matter more properly addressed in an application for post conviction relief, filed in the trial court where a full evidentiary hearing can be conducted. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Johnson, 557 So.2d 1030 (La.App. 4th Cir.1990); State v. Reed, 483 So.2d 1278 (La.App. 4th Cir. 1986). Only if the record discloses sufficient evidence to rule on the merits of the claim do the interests of judicial economy justify consideration of the issues on appeal. State v. Seiss, 428 So.2d 444 (La. 1983); State v. Ratcliff, 416 So.2d 528 (La. 1982); State v. Garland, 482 So.2d 133 (La.App. 4th Cir.1986); State v. Landry, 499 So.2d 1320 (La.App. 4th Cir.1986).
The defendant's claim of ineffective assistance of counsel is to be assessed by the two part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Fuller, 454 So.2d 119 (La.1984). The defendant must show that counsel's performance was deficient and that the deficiency prejudiced the defendant. Counsel's performance is ineffective when it can be shown that he made errors so serious that counsel was not functioning as the "counsel" guaranteed to the defendant by the Sixth Amendment. Strickland, supra at 686, 104 S.Ct. at 2064. Counsel's deficient performance will have prejudiced the defendant if he shows that *352 the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, supra at 693, 104 S.Ct. at 2068. The defendant must make both showings to prove that counsel was so ineffective as to require reversal. State v. Sparrow, 612 So.2d 191, 199 (La.App. 4th Cir.1992).
This court has recognized that if an alleged error falls "within the ambit of trial strategy" it does not "establish ineffective assistance of counsel." State v. Bienemy, 483 So.2d 1105 (La.App. 4th Cir. 1986). Moreover, as "opinions may differ on the advisability of a tactic, hindsight not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined by whether a particular strategy is successful." State v. Brooks, 505 So.2d 714, 724 (La.1987), cert. denied, Brooks v. Louisiana, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).
The defendant first alleges that his trial counsel was ineffective for failing to challenge the arrest warrant. However, as noted above, the affidavit set forth sufficient information to establish probable cause for the defendant's arrest. Therefore, defendant's trial counsel was not ineffective for failing to challenge the arrest warrant as there was no meritorious basis for a challenge. The defendant also argues that trial counsel was ineffective for failing to object to McCray's and Jones' in court identifications of the defendant. However, as discussed above, the identifications were reliable, and the trial court properly allowed the witnesses to make the identifications.
Lastly, the defendant contends that his trial counsel was ineffective for failing to cross-examine McCray and Jones about the inconsistencies between their in court testimony and their statements given to Detective Catalanotto the day of the shooting. Specifically, the defendant contends his trial counsel should have questioned McCray and Jones about their view of the area where the shooting took place. In the statements given immediately after the incident, McCray and Jones stated that they were standing by the dumpsters when the defendant drove up in the red Chevrolet. McCray and Jones also denied any prior altercations with the defendant. However, at trial McCray and Jones testified that they were standing near the front of the lounge by the pay telephone when the defendant drove into the parking lot. The witnesses also admitted at trial that they had been involved in a fight with the defendant prior to the shooting. While trial counsel did not extensively question the witnesses on these exact inconsistencies, he did cross-examine the witnesses on their ability to see the person who drove the red Chevrolet into the parking lot. In fact, a review of the trial transcript reveals that defendant's trial counsel more than adequately cross examined McCray and Jones about the inconsistencies in their testimony and their inability to positively identify the defendant in the photographic lineup. Defendant's trial counsel was not ineffective in his cross-examination of McCray and Jones.
This assignment of error is without merit.
Accordingly, defendant Samuel Green's conviction and sentence are affirmed.
AFFIRMED.