1 .BYRNES, Judge.
Defendant, Terrell McZeal, pleaded not guilty to a charge of second degree murder, a violation of La. R.S. 14:30.1. The trial court found probable cause and denied defendant’s motion to suppress the identification on October 28, 1994. A mistrial was declared during defendant’s first trial, on August 15, 1996. A twelve member jury found the defendant guilty as charged on December 5, 1996. The trial court denied defendant’s motion for new trial on December 20, 1996 and, after defendant waived all legal delays, he was sentenced to life imprisonment. The trial court denied defendant’s motion for reconsideration of sentence, and granted his motion for appeal. On June 2, 1999, in an unpublished opinion, this court vacated defendant’s conviction and sentence and remanded the case for a new trial, due to an incomplete record.[1] Subsequently, the missing portions of the record were made available and, on September 1, 1999, the Louisiana Supreme Court reversed the decision of this court and remanded the case for reconstitution of the record and re-briefing on the merits.[2]
The reconstituted record was lodged with this court on December 8,1999. ¡.FACTS
New Orleans Police Officer Dwayne Marshall testified that on May 21, 1994 he responded to a daytime shooting in the rear driveway of the 2200 block of Lafitte Street, in the Lafitte Housing Development. At the scene, he found a red vehicle with an open door and a black male inside with a fatal gunshot wound to the head. He preserved the crime scene, and a witness, Gina Cannon, advised him that she had observed the shooting. Officer Marshall identified a police report prepared by his partner, Officer Calvin Bradley, reflecting that a description and other information was obtained from Ms. Cannon. Officer Marshall said that a description of the suspect was also broadcast over the police radio: “Wanted subject: Negro male, 15-16, dark complexion, 6’4”, dressed in all black with 1,000,000 on the back of his jacket, carrying a yellow sack.” However, the police report reflects that the perpetrator’s height is six feet, one inch, which height was based on information furnished by Ms. Cannon, and which height was confirmed by Ms. Cannon in her testimony at trial.
It was stipulated that if Dr. Alvera Hunt, of the Orleans Parish Coroner’s Office, were called to testify, he would be qualified as expert in the field of forensic pathology, and would testify that he examined the body of the victim, Kevin Edwards; and that the decedent suffered: “[1] A gunshot wound to the right temple, perforating wound of the brain, and a skull fracture. [2] A superficial gunshot wound to the face through and through, [3] a superficial gunshot wound to the left shoulder through and through, and [4] a superficial graze gunshot wound to the chin.” In addition, Dr. Hunt would testify that a bullet jacket was recovered from the victim’s body. Finally, it was stipulated that a laboratory report would | ¡¡indicate that the victim had no alcohol, drugs, or alkaloids in his system at the time of the examination.
New Orleans Police Officer John Tread-way, qualified by stipulation as an expert in the field of firearms examination, testified that he examined three 10mm cartridge cases recovered from the scene of the homicide, one fired 10mm bullet recovered from the scene, and one fired 10mm bullet recovered during the autopsy of the victim. His examinations revealed only *829 that the three cartridge cases had been fired by the same weapon, and that the two fired bullets both had polygonal rifling. He did not have a gun to test fire.
New Orleans Police Detective Thomatra Green testified that she responded to the homicide, and collected[3] eighteen partial fingerprints, fifteen from the driver’s door of the 1985 Mercury, and three from a liquor bottle found inside.
Gina Cannon testified that on May 21, 1994, she worked the morning shift at the Quality Inn Midtown, and that the latest she would have gotten off work was between 4:30 and 5:00 p.m., 6:00 p.m. at the latest. She then proceeded to 2211 Lafitte Street, in the Lafitte Housing Development, to pick up her children, whom she left with her grandmother while she worked. She stopped at a Citgo gas station at the corner of Tulane Avenue and Broad Street, where she purchased two lottery tickets for her grandmother. As she drove to pick up her children, she had the driver and passenger windows rolled down, and the lottery tickets flew onto the floorboard. When she got to the Lafitte Housing Development, she parked her yellow and gold LTD in the back driveway. She leaned over to pick up the lottery tickets, and heard a car pull alongside of her. She looked up to see a red car | occupied by two black males, which was close enough to hers so that her driver’s door would hit the other vehicle’s passenger door if it was opened. Ms. Cannon identified crime scene photographs of her vehicle and the red car. She heard three shots, and remained down. She waited for approximately one minute, and looked up to see someone walking away from the vehicle. The man turned his head to look, and she noted that he had what she later learned was “cleft lip.” This was the first time she had seen the man’s face. At the time she described it as a “Mack at Night” face, likening it to a “moon face” depicted in a McDonald’s hamburger commercial. She identified defendant as that individual. She said he was wearing black nylon jogging pants, a black T-shirt with ten million on the back of it, and dark-colored tennis shoes, and he was putting a black gun into a yellow and blue bag he was carrying. She saw defendant some three to four days after the murder talking on a pay telephone, and drove to the nearby Sixth District police station to report the sighting. Ms. Cannon viewed a photographic lineup on May 23, 1994, in which she identified defendant’s photograph. She said she observed defendant in “broad daylight,” with nothing blocking her view. Ms. Cannon had never seen defendant before that day, and she said she remembered him only because of his cleft lip.
When presented with the photo lineup during cross examination, Ms. Cannon admitted that defendant’s photograph was the only person depicted who had a cleft lip. Ms. Cannon said on cross examination that she saw defendant seated in the passenger seat of the red car, but did not see the shooting. However, she said she saw defendant exit the car with the gun in his hand. Ms. Cannon denied telling police at the scene that the gunman was wearing shorts (she said pants) or that his shirt had one million on it (she said it was ten million). She was 1 ¡^positive she told police that the gunman had a long moon shaped face, and that something was wrong with his lip. She said she did not tell police the gunman was six feet four inches tall, but only six feet or six feet one inch tall. Ms. Cannon stated on redirect examination that she saw defendant exit the car with the gun right after she heard the shots.
New Orleans Police Officer Raymond Griffin testified that on June 23, 1994,[4] he was leaving the Sixth District Police Sta *830 tion when Ms. Cannon approached and informed him that she could identify a person wanted for murder. He and other officers proceeded to the location where Ms. Cannon directed them, and saw defendant enter a vehicle, which was preparing to drive off. Officers stopped the vehicle, took defendant into custody, and later transported him to the homicide office. No firearm or ammunition was found on defendant’s person at the time of his apprehension.
New Orleans Police Detective George Waguespack and two other homicide detectives investigated the shooting death of Kevin Edwards. Det. Waguespack said two bullets struck Ms. Cannon’s vehicle; one penetrated two windows, one on each side, and one penetrated the door. He observed the three spent cartridge casings at the scene before they were retrieved, and said a brown paper bag containing $3,196 in cash and a piece of crack cocaine was found in the glove compartment of the victim’s vehicle. He said Ms. Cannon appeared extremely upset and was shaking. He interviewed her at the scene and gave her his card, telling her he would like to interview her later, when she was more calm and collected. The following Monday, Det. Waguespack was contacted by a Sixth ^District unit and informed that they had suspect in the murder who had been identified by a witness. He spoke to Ms. Cannon at the Sixth District station, where she informed him that she was positive that defendant was the person who shot and killed Kevin Edwards. He had her transported to the homicide office, where she identified defendant’s photograph in the lineup.
Det. Waguespack stated on cross examination that he recalled Ms. Cannon telling him that the gunman wore dark pants, not shorts. He admitted that although the witness had described a firearm and a very specific shirt, defendant’s residence was never searched, in part because there was a discrepancy as to where defendant resided, in part because the homicide bureau 'had a heavy caseload at that time. Officer Waguespack admitted that a motive was never established. He said Ms. Cannon never described the gunman as having a cleft lip, only a “moon face.” He admitted there was no further investigation into the shooting death of Kevin Edwards after defendant was arrested.
Yomera Williams Edwards testified that she and the victim were high school sweethearts, and had married in 1987. The couple had two children; a third child was born after Kevin was murdered. She last saw Kevin around 4:00 p.m. He was driving her burgundy Mecury on that date. She said she knew the majority of her husband’s friends, and did not know defendant. She also said she did not know Gina Cannon.
Kelly Gibson, defendant’s girlfriend, testified that on the day of the murder, in the late morning, she and defendant drove to Lakeside Shopping Center, where they browsed for a couple of hours. She dropped him off at a barber shop on Bien-ville Street that evening, a place where defendant and his friends gathered on some Saturdays. Ms. Gibson picked up defendant as it was getting dark, and they |7went to the lakefront to socialize and drink and eat crawfish. They went home after that. Ms. Gibson said she had known defendant for almost three years. She did not know whether he had ever been to the Lafitte Housing Development. She said defendant did not have a job or attend school during them relationship. She did not make any purchases at Lakeside Shopping Center, and thus had no receipts from that date.
Michael Pailet testified that he had been a barber since he was sixteen years old-approximately eight years. His barbershop was located on Bienville Street at the time of the murder. He said he cut defendant’s hair every Saturday, at around 4:30 p.m. Mr. Pailet testified on cross examination that he used appointment books, and that although defense counsel asked him to bring them to court, he forgot them. *831 However, he said he did not have the appointment book from two years ago anyway, but had used one at that time. He said there were other persons in the barber shop at the time defendant was there on that date, but could not specifically name anyone, although he related the names of two individuals who usually come on Saturday at 3:30 and 5:30 p.m. He did not see who dropped defendant off, or know the exact time he was dropped off, but knew defendant did not miss his appointment.
Leroy Jones testified that he saw defendant at the barber shop on the Saturday afternoon prior to defendant’s arrest, when he went for his biweekly haircut. He only knew defendant as a fellow patron of the barber shop, and said there was group of people who went there every week. Mr. Jones confirmed that defendant had a distinctive looking face. He said his appointment had been somewhere around 4:30 or 5:00 p.m. He got there before defendant, and defendant | Swas still there when he left after getting his haircut. It was after 5:00 p.m. when he left.
New Orleans Police Detective Calvin Beasley[5] was at the scene of the homicide and prepared a report. He said a Ms. “Green” gave him a description of the perpetrator as six feet one inch tall, with a long “banana face,” wearing a black shirt with one million on the front, and black shorts. He stated on cross examination that the witness seemed to be dazed and in shock, and he thought she might be hyperventilating. Det. Beasley was the initial responding officer, not the homicide detective who investigated the case.
New Orleans Police Detective Dwayne Marshall was with Det. Beasley when the witness, who he said was upset, gave a description of the perpetrator as being in his early teens or late teens, or early twenties, about six feet tall, wearing a black shirt with the number one million dollars or a one with a bunch of zeros on it, and black pants or shorts. He said the most noticeable characteristic she described was that the perpetrator’s face was unusually long.
Defendant testified that he did not kill Kevin Edwards, and said he had not known the victim. He stated that on the day of the murder he woke up, went to his mother’s home for some coffee, then went to Lakeside Shopping Center, where he browsed for approximately one and a half hours. His girlfriend dropped him off at the barber shop, and he got a haircut. She later picked him up, and they ate crawfish and drank daiquiris with some friends. He said he normally goes to the barber shop on Saturdays, and had been going there for approximately one year. Defendant acknowledged that the harelip trait ran in his family. Defendant 19admitted to carrying a concealed gun on November 24, 1993, some six months prior to the murder, and to pleading guilty to that offense. He stated on cross examination that he did not go to the barber shop every Saturday, only every other Saturday, and said the time he got his haircut varied, depending on the barber’s schedule. He admitted that he was not working or attending school at the time of the murder. He did not know Gina Cannon, and said that to his knowledge she had no grievance against him. He did not hear anything about the murder until he was picked up by police and taken to the homicide office.
Gina Cannon, recalled as a rebuttal witness, testified that she saw the murderer of Kevin Edwards face-to-face. She vividly recalled his face, and said she would see it when she closed her eyes to go to sleep.

ERRORS PATENT

A review of the record reveals one error patent. The minute and docket mas *832 ter entries from the date of sentencing both reflect that the trial court sentenced defendant to life imprisonment at hard labor, with no restrictions as to the benefits of parole, probation or suspension of sentence. La. R.S. 14:80.1 provides that whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. Thus, defendant received an illegally lenient sentence. However, this court will not correct an illegally lenient sentence on appeal where the State does not raise the issue. State v. Jones, 99-0861, p. 6 (La.App. 4 Cir. 6/21/00), 769 So.2d 28, 35; State v. Mims, 97-1500, p. 24 (La.App. 4 Cir. 6/21/00), 769 So.2d 44, 61.
I ^(ASSIGNMENT OF ERROR NO. 1
In this assignment of error, defendant claims that the trial court erred in denying the motion to suppress his out-of-court identification by Ms. Cannon, as it was both suggestive and unreliable.
The defendant bears the burden of proving both that an out-of-court identification was suggestive, and that there was a substantial likelihood of misidentification as a result of the identification procedure. State v. Ballett, 98-2568, p. 17 (La.App. 4 Cir. 3/15/00), 756 So.2d 587, 597; State v. Martello, 98-2066, p. 8 (La.App. 4 Cir. 11/17/99), 748 So.2d 1192, 1198. An identification procedure is suggestive if it focuses attention on the defendant. State v. Laymon, 97-1520, p. 16 (La.App. 4 Cir. 3/15/00), 756 So.2d 1160, 1172. However, even a suggestive identification will be admissible if it is found reliable under the totality of circumstances. Id. In Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), the United States Supreme Court set forth a five-factor test to determine whether an identification is reliable: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness’s degree of attention; (3) the accuracy of the witness’s prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. State v. Green, 98-1021, p. 12 (La.App. 4 Cir. 12/22/99), 750 So.2d 343, 350, writ denied, 2000-0235 (La.8/31/00), 766 So.2d 1274. In reviewing a trial court’s ruling on a motion to suppress, an appellate court is not limited to evidence adduced at the hearing on the motion to suppress; it may also consider any pertinent evidence given at trial of the case. State v. Nogess, 98-0670, p. 11 (La.App. 4 Cir. 3/3/99), 729 So.2d 132, 137.
| ^Defendant claims the photographic lineup was suggestive for one reason-the photo of defendant depicted him with a harelip, while none of the other five individuals in the display had a harelip.[6] Gina Cannon testified that the only reason she remembered defendant was because of his harelip, what she referred to as a “cleft lip.” The difficulty faced by Officer Wag-uespack in compiling the photo lineup is obvious-trying to find five individuals who resembled defendant with regard to the shape of the face, skin tone, hair characteristics, facial hair or lack thereof, etc., yet who also had harelips. Keeping that fact in mind, it nevertheless must be assumed that the lineup was suggestive.
The murder occurred on an early Saturday evening in May, during daylight hours. Gina Cannon stated that she got a good look at defendant’s face when he turned his head toward her while walking away from the murder scene. While Ms. Cannon was obviously very shaken, at least by the time police interviewed her, there is no evidence that when she looked at the gunman’s face her attention was focused anywhere but on that face. While *833 Ms. Cannon testified that she informed police officers that defendant had something wrong with his lip, none of the police officers who interviewed her remembered her giving such a description. In addition, a box on the supplemental police report next to the descriptive term “harelip” was not checked off. Ms. Cannon also said she described the gunman as having a long moon face. The supplemental police report contains the description of a long face, and two police officers said the witness described the gunman as having a long face. However, Det. Waguespack, who spoke to Ms. Cannon at the scene, and who presented the photographic lineup to the witness, testified at trial |1?and at the motion to suppress hearing that she described a moon face to him. Ms. Cannon said the gunman wore long black jogging pants. The supplemental police report reflects a description of black shorts, and one police officer testified that Ms. Cannon said shorts.
A second officer testified that she said either black shorts or pants, while Det. Waguespack testified that Ms. Cannon described dark pants. There was a discrepancy as to whether the gunman’s black T-shirt had 1,000,000 or 10,000,000 on it. Two police officers testified that Ms. Cannon reported the number as 1,000,000. A third said it was either 1,000,000 or a one with a “bunch of zeros.” Ms. Cannon testified that the number was 10,000,000. We find that when dealing with so many zeroes it would be easy to make a mistake, clerical or otherwise, one order of magnitude one way or another. For example, at page three of defendant’s brief the number is referred to as “10,000,00” while on page 7 the number is written as “10,000,000.” Such discrepancies are not significant.
“Officer” Dwayne Marshall testified on behalf of the State that he put out a description on the police radio of a black male, six feet four inches tall, and age 15-16. “Detective” Dwayne Marshall testified on behalf of defendant that Ms. Cannon described the height of the perpetrator as about six feet tall, with his age as the early or late teens, or early twenties. Although the description put out by the police described the perpetrator as six feet four inches tall, Ms. Cannon said she did not tell police the gunman was six feet four inches tall, but maybe six feet or six feet one inch tall.
The defendant attempts to infer from the description put out by the police that Ms. Cannon had originally described the defendant to the police as being six feet four inches tall, but there was no testimony to that effect. Det. Beasley | istestified that the description given by Ms. Cannon was six feet one inch tall. The supplemental police report states that the gunman was six feet one inch tall.
Despite these minor discrepancies in descriptions, Ms. Cannon testified that she was certain that defendant was the gunman. She identified him in daylight on a public street and in the photographic lineup only two days after the murder. The evidence establishes that defendant is very distinctive looking. Considering the totality of the circumstances, defendant has failed to show that the identification was unreliable or that the jury misunderstood the identification dispute.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 2

In this assignment of error, defendant claims the evidence was insufficient to sustain his conviction.
This court set out the well-settled standard for reviewing convictions for sufficiency of the evidence in State v. Ragas, 98-0011 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of act could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 *834 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. “[A] reviewing court is not called upon to decide -whether it believes the witnesses or whether the | ^conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
98-0011 at pp. 13-14, 744 So.2d at 106-107, quoting State v. Egana, 97-0318, pp. 5-6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 227-228.
Defendant was convicted of second degree murder, defined in pertinent part by La. R.S. 14:30.1(A)(1) as the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm.
Defendant points to the lack of any motive for him to murder Kevin Edwards, although recognizing that a motive does not need to be proven. He also cites the lack of any evidence connecting him in any way to the victim other than the testimony of Ms. Cannon as to the murder; the lack of any physical evidence connecting him to the crime or the crime scene; and the purported alibi testimony from his girlfriend and barber. He avers that neither his girlfriend nor his barber had any motivation to lie for him.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Jones, 97-2591, p. 7 (La.App. 4 Cir. 9/8/99), 744 So.2d 165, 169, writ denied, 99-3141 (La.4/7/00), 759 So.2d 91. A factfinder’s credibility decision should not be disturbed unless it is clearly contrary to the evidence. State v. Harris, 99-3147, p. 6 (La.App. 4 Cir. 5/31/00), 765 So.2d 432, 435.
The jury obviously did not believe the testimony of defendant’s girlfriend, Kelly Gibson, or his barber, Michael Pallet, or felt they were mistaken in their recollection. The jury believed Gina Cannon, who was positive that defendant, who had a distinctive-looking face, committed the murder. Ms. Cannon’s testimony was not internally inconsistent, or in irreconcilable conflict with any physical evidence. There was no reason to disbelieve her identification of defendant other than mistaken identity, and none of the evidence presented suggests a mistaken identification. It cannot be said that the jury’s factual conclusion is clearly contrary to the evidence.
*835 There is no merit to this assignment of error.
For the foregoing reasons the defendant’s conviction and sentence are affirmed.

CONVICTION AND SENTENCE AFFIRMED.

. State v. McZeal, 98-2154 (La.App. 4 Cir. 6/2/99), 739 So.2d 1028.

. State v. McZeal, 99-1908 (La.9/8/99), 747 So.2d 521.

. Detective Green did not identify the fingerprints. Her responsibility was to collect the prints, not to analyze them. Detective Green passed the prints on to someone else for analysis.

. The evidence establishes that this was May 23, 1994.

. This "Detective Calvin Beasley” apparently is the same person referred to by Officer Dwayne Marshall as "Officer Calvin Bradley” when "Officer” Marshall testified for the State on 12/4/96. "Detective” Dwayne Marshall and "Detective Calvin Beasley” testified for the defense on 12/5/96.

. The record contains a letter from the Clerk of Criminal District Court, for the Parish of Orleans, stating that the photographic lineup introduced into evidence at trial in this case cannot be located. However, Ms. Cannon testified that defendant was the only person depicted in the lineup who had a harelip.