756 So.2d 587 (2000)
STATE of Louisiana
v.
Brian A. BALLETT.
No. 98-KA-2568.
Court of Appeal of Louisiana, Fourth Circuit.
March 15, 2000.
*589 Harry F. Connick, District Attorney of Orleans Parish, Charles E.F. Heuer, Assistant District Attorney of Orleans Parish, New Orleans, Louisiana, Counsel for Plaintiff/Appellee.
Yvonne Chalker, Louisiana Appellate Project, New Orleans, Louisiana, Counsel for Defendant/Appellant.
(Court composed of Judge WILLIAM H. BYRNES, III, Judge MOON LANDRIEU, Judge DENNIS R. BAGNERIS, Sr.)
LANDRIEU, Judge.
On July 10, 1997, the State of Louisiana, by grand jury indictment, charged the defendant, Brian A. Ballett, with multiple counts of aggravated rape, aggravated kidnapping, armed robbery, attempted armed robbery, first degree robbery, attempted first degree robbery, second degree kidnapping, and attempted aggravated rape *590 arising out of four separate incidents. Count one charged the defendant with the aggravated rape of B.W.[1] in violation of La. R.S. 14:42. Count two charged the defendant with the aggravated kidnapping of B.W. in violation of La. R.S. 14:44. Count three charged the defendant with the first degree robbery of B.W. in violation of La. R.S. 14:64.1. Count four charged the defendant with the second degree kidnapping of T.W. in violation of La. R.S. 14:44.1. Count five charged the defendant with the aggravated rape of T.G. in violation of La. R.S. 14:42. Count six charged the defendant with the aggravated kidnapping of T.G. in violation of La. R.S. 14:44. Count seven charged the defendant with the armed robbery of T.G. in violation of La. R.S. 14:64. Count eight charged the defendant with the aggravated rape of T.L. in violation of La. R.S. 14:42. Count nine charged the defendant with the aggravated kidnapping of T.L. in violation of La. R.S. 14:44. Count ten charged the defendant with the attempted first degree robbery of T.L. in violation of La. R.S. 14:27(64.1). Count eleven charged the defendant with the attempted aggravated rape of J.H. in violation of La. R.S. 14:27(42). Count twelve charged the defendant with the aggravated kidnapping of J.H. in violation of La. R.S. 14:44. Finally, count thirteen charged the defendant with the armed robbery of J.H. in violation of La. R.S. 14:64.
The defendant pled not guilty on all counts. He filed motions to suppress confessions and identifications, which the trial court denied. Following a two-day trial, the jury found the defendant guilty as charged.
The defendant was sentenced to separate sentences of life imprisonment at hard labor without benefit of probation, parole or suspension of sentence on count one and count two. On count three, the defendant was sentenced to serve forty years at hard labor without benefit of probation, parole or suspension of sentence. On count four, the defendant was sentenced to serve forty years at hard labor without benefit of probation, parole or suspension of sentence. The trial court imposed separate sentences of life imprisonment at hard labor without benefit of probation, parole or suspension of sentence on count five and count six. On count seven, the defendant was sentenced to serve ninety-nine years at hard labor without benefit of probation, parole or suspension of sentence. The defendant received separate sentences of life imprisonment at hard labor without benefit of probation, parole or suspension of sentence on count eight and count nine. The defendant was sentenced to serve twenty years at hard labor on count ten. On count eleven, the defendant was sentenced to fifty years at hard labor without benefit of probation, parole or suspension of sentence. On count twelve, the defendant was sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. On count thirteen, the defendant was sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence.
The trial court ordered that counts one through four be served concurrently to each other but consecutively to counts five through seven, counts eight through ten and counts eleven through thirteen. Counts five through seven were to be served concurrently to each other but consecutively to counts one through four, counts eight through ten and counts eleven through thirteen. Counts eight through ten were to be serve concurrently to each other but consecutively to counts one through four, counts five through seven and counts eleven through thirteen. Counts eleven through thirteen were to be served concurrently to each other but consecutively to counts one through four, *591 counts five through seven and counts eight through ten.

FACTS
On February 27, 1997, B.W. got out of school at 3:15 p.m. and walked to her sister's house. When she arrived, she waited for the nursery bus to drop off her two year old niece, T.W. After T.W. got home, B.W. packed up the child's diaper bag and she and T.W. began walking to her house. B.W. was carrying T.W. as well as her school bag and the diaper bag. The two of them walked through Sampson Park, crossed Piety Street and went down Benefit Street. As they walked on Benefit Street, B.W. noticed the defendant walking in front of her. She walked past him as he stopped to tie his shoes. When she passed him, the defendant came up behind her and asked if T.W. was her child. She said no. The defendant then told her that he had a gun and to walk with him. While she did not see the gun, she could feel it. The defendant took her down an alleyway and into an abandoned building. The defendant searched B.W.'s book bag and the diaper bag. He pulled down B.W.'s pants and underwear and told her to bend over. As she did, Taylor hit her head on a step. The defendant was trying to put his penis in B.W.'s anus. The defendant took B.W.'s earrings, nameplate and chain. He told her to turn around and raped her vaginally. Before the defendant left, he told her to count to one hundred. B.W. ran home and told her mother about the incident. Her mother took B.W. to the police sub-station and then to the hospital. B.W. provided the police with a description of the defendant as being tall, slim, brown skinned with a low haircut. She estimated the defendant's age to be between twenty-five and thirty years of age. The defendant was wearing a blue jogging sweat jacket, blue jeans and black tennis shoes. B.W. was not able to identify the perpetrator in a photographic lineup conducted on March 3, 1997. Later, she assisted a police sketch artist, Mr. John Donnels, in composing a sketch of her attacker. In a second photographic lineup on May 13, 1997, B.W. identified the defendant as the perpetrator, and later, at the trial, she identified him as the person who kidnapped, raped and robbed her.
T.G. testified that she was coming home from a "jam" in the Florida Housing Development on Sunday, April 20, 1997. After leaving the party, she took a bus from Louisa Street to Chef Menteur and Gentilly Boulevard. When T.G. got off the bus, she crossed Chef Menteur and went to use a pay phone. The defendant, a woman and a child also got off the bus. The defendant followed her across the street. While T.G. was on the phone with her boyfriend, her back was towards the defendant. When she got off the phone, the defendant went up to her and hugged her. T.G. asked the defendant what was his problem. The defendant took his hands off of T.G. At that time, T.G. noticed that another bus was pulling to the side. Both T.G. and the defendant got on the bus. T.G. sat in the middle of the bus. The defendant took a seat in the rear of the bus. When T.G. got off of the bus at Broad Street, she noticed that the defendant also got off of the bus. After the bus passed, the defendant grabbed T.G. and told her that he had a gun. The gun was long and silver. The defendant walked her towards a levee and went down an alleyway near an abandoned house. They went into the abandoned house's yard. The defendant ripped her clothes off and vaginally raped her. The defendant took her jewelry and told her to leave. When T.G. arrived home, she called her boyfriend and the police. She took off her clothes and wiped herself clean. T.G. gave the police officers a description of her attacker. She stated that he was dark with a low haircut and had a gap in his teeth. He was wearing a white tee shirt, black or navy blue sweat pants and black tennis shoes. She was taken to the hospital for an examination. T.G. identified the defendant in a photographic lineup on May 13, 1997, and at trial as the perpetrator.
*592 Detective Edward Gai investigated B.W.'s rape in February of 1997. He met with the victim at the hospital on February 27, 1997. He presented the victim with a photographic lineup in March of 1997. However, the victim was not able to identify the perpetrator. The officer testified that the defendant's photograph was not in the first lineup. Det. Gai arranged for B.W. to meet with Mr. Donnels, the sketch artist. The officer took B.W. and her mother to Donnels' studio and picked them up when the session was over. Det. Gai prepared a wanted bulletin after receiving the composite sketch from Mr. Donnels. Det. Gai presented a second photographic lineup to B.W. on May 13, 1997. The victim identified the defendant as the perpetrator.
Det. Gai also investigated the rape of T.G.. He interviewed the victim on the day of the incident. Det. Gai showed her a photographic lineup on May 13, 1997. She identified the defendant as the perpetrator.
At approximately 10:00 p.m. on May 9, 1997, T.L. was walking home from a friend's house. She was walking on Pleasure Street towards Louisa Street when she noticed the defendant walking towards her. As she attempted to pass the defendant, he grabbed her and stuck something hard in her side. The defendant was directly in front of her and she looked him in the face. The defendant told her to walk with him. T.L. told the defendant that her brother was sitting on some steps nearby. The defendant took her down an alleyway and went into an abandoned building. There were people in the building so the defendant took her into a courtyard behind the building and then entered another abandoned building. The defendant took her clothes off and raped her. The defendant asked if she had any jewelry or money. She said no. He then told her to count to fifty before leaving. The victim counted to five and ran home. She took a bath and told her mother about the incident. She and her mother went to the police station. She did not tell the police about the rape because she was too humiliated. She informed them only about the attempted robbery. T.L. described the perpetrator as 5'4", 140 pounds and having a bald head and two gold teeth. The defendant was wearing a gray tee shirt and blue jeans. She estimated his age to be twenty-seven years old. Later, T.L.'s mother told the police about the rape. When the officers confronted her, she told them about the rape. In a photographic lineup shown to her on May 13, 1997, T.L. identified the defendant as the perpetrator.
Det. Joseph Goins investigated T.L.'s rape. He interviewed the victim and her mother on May 13, 1997. The victim told him the rape occurred on May 9, 1997. She stated that when she went to the police station on May 9th, there were a number of male police officers there and she felt humiliated. T.L. directed the officer to the place where the rape occurred. It was an abandoned building at 3341 Benefit Street. Det. Goins sent the Crime Lab to photograph and process the scene.
Ms. Patricia Daniels, a medical technologist with the Orleans Parish Coroner's Office, examined the specimens collected during the rape examinations of B.W., T.G. and J.H. Testing of the specimen collected during the examination of B.W. indicated that all swabs and smears tested negative for seminal fluid and/or semen. B.W. has Group O type blood. Testing of the specimens collected during the examination of T.G. resulted in negative findings for seminal fluid and/or semen. T.G. has Group O type blood. Testing of the specimen taken during the examination of J.H. also resulted in negative findings for seminal fluid and/or semen. J.H. has Group A type blood.
Dr. George Schwartzenburg performed a sexual assault medical examination on J.H. on May 10, 1997. The victim gave a history of a kidnapping and attempted rape. The victim said that the perpetrator touched her on her stomach, chest and *593 genital area. The examination showed three areas of abrasion type irritations on the labia. One area fluoresced with the Woods Lamp. The findings were consistent with the history given by the victim.
Officers Reginald Landry and Wellington Beaulieu showed T.L. a photographic lineup on May 13, 1997. T.L. identified the defendant as the person who attempted to rob her. She then told the officers that the defendant had also raped her. T.L.'s mother had told the officers about the rape. T.L. confirmed what her mother had told the police officers.
M.H., the mother of J.H., was at home at approximately 5:00 p.m. on May 10, 1997, when she was advised that someone had kidnapped her daughter. A police officer and J.H.'s friend, L.W., came to her house and told her what happened. The officer took her to the scene of the incident near Benefit Street. There were a number of abandoned buildings across from Sampson Park. M.H. walked around the area calling her daughter's name. She heard a woman say, "there she is" and saw the little girl, naked, running to the woman's car. M.H. recognized J.H. and also ran to the car. The woman put a raincoat around J.H., and they sat in the car until the police arrived. M.H. asked J.H. if the man raped her. J.H. said no but the man took all of her clothes and tied her up. When the police arrived, the officers took J.H. and her mother to the hospital. After J.H. was treated at the hospital, they went to the police station where J.H. spoke with the officers.
On May 10, 1997, J.H. and L.W. were playing in Sampson Park. As they walked on Benefit Street on their way home, the defendant grabbed J.H. and told her something. L.W. jumped in the street and ran to the police station on Pleasure Street. She told Officers Precious Davis and Rita Irving that a man grabbed her friend. L.W. showed the officers where the incident occurred. Officer Irving searched the area while Officer Davis and L.W. went to get J.H.'s mother. Ms. Holmes helped to look for J.H. L.W. heard that the officers found J.H. Later that evening, L.W.'s mother took her to see J.H.
J.H. testified that after the defendant grabbed her, he pulled her into an alleyway. The defendant told her to be quiet or he would shoot her. He showed her his gun. The defendant then took J.H. into an empty building. He asked if she had any money. She gave him the coin change that she had. The defendant also took her medallion chain. The defendant told J.H. to lie down. He pulled J.H.'s shirt over her face and pulled down her shorts and underwear. The defendant touched her chest and vaginal area. J.H. heard her mother calling her name. The defendant asked J.H. if that was her name. She said no. The defendant told her to count to one hundred before she left. The defendant had tied her hands behind her back with something. After the defendant left, she waited a short while and then ran to a window. She saw a woman in a car. The woman told her to come down. J.H. ran to the woman in the car. J.H.'s mother showed up a few minutes later. J.H. told her mother what happened. The police took her and her mother to the hospital. After she left the hospital, she met with the police. J.H. identified the defendant at trial and in a photographic lineup as the person who kidnapped, robbed and attempted to rape her.
Officer Kevin Williams participated in the search for J.H. At approximately 5:30 p.m. on May 10, 1997, Officer Williams and his partner, Officer Darryl Holloway, heard a broadcast via police radio that a young female had just been kidnapped. The officers checked the thirty-three hundred block of Benefit Street and the thirty-three hundred block of Desire Parkway. The officers checked the abandoned buildings along Benefit Street. During the course of their search, the officers heard a female voice calling out a name. A few minutes later, the officers were informed via police radio that the child had been seen running along Pleasure Street. As *594 the officers proceeded towards Pleasure Street, a woman driving a tan Honda Accord stopped them. The woman advised the officers that she had the young girl in her car. When the officers reached the vehicle, they observed that the young girl was in the back seat with her mother. The child was hysterical and crying. Officer Williams placed the girl and her mother in his vehicle. The woman in the Honda told the officer that the girl's hands had been tied behind her back with her underwear. The officer took possession of the underwear. The child told the officer where the incident occurred. Officer Williams proceeded to the location and observed the child's clothes in the abandoned apartment. The officer requested the Crime Lab to process the scene, including the clothing. Officer Williams then took the young girl and her mother to the hospital.
Officer Rita Irving was stationed at the C.O.P.S. station in the Florida Housing Development on May 10, 1997. At approximately 5:15 p.m., she became involved in the investigation of the kidnapping of J.H. Officer Irving and her partner, Officer Precious Davis, were in the C.O.P.S. office when L.W. came into the station and told them that an unknown man had just grabbed her friend, J.H. Officer Irving informed Sgt. Gay, and the three officers proceeded to Benefit Street by Sampson Park to search for the child. Officer Irving and Sgt. Gay proceeded to canvass the area while Officer Davis and L.W. went to inform J.H.'s mother of the incident. Other officers also assisted in canvassing the area. When J.H.'s mother arrived on the scene, J.H.'s mother started to call out the girl's name. Sgt. Gay was at the corner of an abandoned building when he saw a man run from another abandoned building. Officer Irving and Sgt. Gay pursued the subject until the subject ran under a house. A canine unit was called out. Officer Irving stayed by the house until the canine unit arrived. Officer Irving observed the dog walk around the residence and make a hit under the building. Officer Irving saw the defendant taken from under the building. She identified the defendant at trial as the person who was taken from under the house. The defendant was transported to the C.O.P.S. office and then to police headquarters.
Det. Aaron Blackwell of the Child Abuse Division was called to the thirty-three hundred block of Desire at approximately 5:30 p.m. on May 10, 1997. When the officer arrived on the scene, the defendant had been apprehended and the victim taken to the hospital. After surveying the scene, the officer spoke with several witnesses. He determined that there had been a kidnapping and a possible attempted rape. Det. Blackwell went to C.O.P.S. station and spoke with the defendant. The officer advised the defendant of his rights and that he was under arrest. The defendant indicated he understood his rights. The defendant denied any involvement in the incident and told the officer that he could "bring the little girl back before me, she can't identify me. She doesn't know me." The defendant was transported to police headquarters for booking and then Central Lockup. Later that evening, Det. Blackwell met with J.H. at police headquarters. He presented a photographic lineup to J.H. She identified the defendant as the person who kidnapped, robbed and attempted to rape her. After arresting the defendant, the officer looked at the composite sketch received by his unit and noticed a similarity. Det. Blackwell contacted Det. Gonzalez of the rape unit.
Ms. Deborah Arnolie was driving in the area of Benefit and Louisa Streets in the late afternoon of May 10, 1997, when she saw police officers with a young girl. She asked the child what was wrong. The child told her that the child's friend had just been abducted and the police were searching the area. Ms. Arnolie and her husband decided to help in the search. They drove up Pleasure Street through the development and turned onto Desire. They heard a squeaking noise twice, *595 looked up, and saw a young girl in a second floor window of an abandoned building. Ms. Arnolie told the young girl to run. Ms. Arnolie saw the young girl run around the building. At the same time, she saw a man running from the courtyard. The young girl, who was nude, ran into her arms. The girl's hands were tied behind her back with her underwear. Ms. Arnolie put a raincoat around the child. Shortly thereafter, the child's mother and police arrived.
Sgt. Howard Gay assisted Officers Davis and Irving in the search for J.H. Officers Davis and Irving advised him that a young girl had come into the C.O.P.S. station and informed them that an unknown man had just grabbed her friend. The officer proceeded to the area where the children were when the incident occurred. Sgt. Gay and the other officers searched the abandoned buildings in the area. The officer was walking in front of the abandoned buildings when a woman walked to him and told him that her daughter had been previously attacked in one of the buildings. The woman showed Sgt. Gay the building where the attack occurred. The officer then proceeded to search the building. As he walked to the building, a nude young girl ran out of the building. A black man, wearing a blue warm-up suit and a white top, also ran from the building. Sgt. Gay pursued the man while other officers took care of the child. The man went under a building on Pleasure Street. Sgt. Gay called for a unit to surround the building and requested a canine unit. When the canine unit arrived, the dog went under the residence and pulled the man from under the building. Sgt. Gay identified the defendant at trial as the person who he saw running from the abandoned building.
Dr. Angelica Charwla conducted a rape examination on B.W. on February 27, 1997. The physician took a history from the victim, who stated that she had been raped vaginally. The examination revealed that there was an absence of hymenal tissue. The physical examination was compatible with the victim's history of sexual assault.
Dr. James Moises performed a rape examination of T.G. on April 21, 1997 at 2:30 a.m. T.G. gave a history of being vaginally raped in the evening hours of August 20, 1997. During the physical exam, the doctor noted no signs of any tears or bruising to the vaginal area. There was no evidence of seminal fluid or semen. However, Dr. Moises stated that such evidence did not mean there was no penetration. The victim had been pregnant four times and had three children. Dr. Moises testified that it was more likely to see trauma or bruising in someone younger, who had been less sexually active and had not given birth.
Officer Keith Barker, a criminalist with the New Orleans Police Department Crime Lab, tested the clothing found in T.G.'s rape kit. No blood or seminal fluid were found on any of the clothes. The officer also examined J.H.'s clothing. The clothes were negative for seminal fluid, hair and/or blood. Officer Barker also examined the back seat cushion of Ms. Arnolie's vehicle for blood, hair and/or seminal fluid. All tests were negative.
Officer Joseph Tafaro examined B.W.'s clothing for blood, hair or seminal fluid. The tests were negative for hair and seminal fluid. There was a positive test for the presence of blood. However, the officer was unable to type the blood.

ERRORS PATENT
A review of the record for errors patent reveals that the trial court imposed an illegally excessive sentence on count thirteen. Count thirteen of the indictment charged the defendant with armed robbery of J.H. The defendant was found guilty as charged on that count. At the sentencing hearing, the trial court sentenced the defendant to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence on count thirteen. However, La. R.S. 14:64 provides that "[w]hoever commits the crime of armed *596 robbery shall be imprisoned for not less than five years and not more then ninety-nine years, without benefit of probation, parole or suspension of sentence." Thus, the life sentence imposed is illegally excessive. The defendant's sentence on count thirteen is vacated and the matter remanded for resentencing on count thirteen.

ASSIGNMENTS OF ERROR NUMBERS 1, 2, & 3
In these assignments, the defendant contends the State failed to produce sufficient evidence to support his convictions for the aggravated rape of J.H., the armed robbery of B.W., and the attempted armed robbery of T.L.
When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La. 1987).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. La. R.S. 15:438 is not a separate test from Jackson v. Virginia, supra, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, supra.
A review of the appellate record reveals that the defendant's argument is without merit. The defendant was not charged with aggravated rape of J.H. He was charged with and convicted of attempted aggravated rape of J.H. Further, the defendant was not charged with armed robbery of B.W. and/or attempted armed robbery of T.L. He was charged with and convicted of first degree robbery of B.W. and attempted first degree robbery of T.L.
The evidence presented at trial supports the defendant's convictions for the attempted aggravated rape of J.H., the first degree robbery of B.W. and the attempted first degree robbery of T.L.
Aggravated rape, La. R.S. 14:42, is defined in part as intercourse without the lawful consent of the victim because it is committed when the victim is prevented from resisting the act because the offender is armed with a dangerous weapon or when the victim is under the age of twelve years. Attempt occurs when a person has the specific intent to commit a crime and does an act tending directly toward the accomplishing of his object. La. R.S. 14:27. In the present case, J.H. testified that the defendant abducted her and took her into an abandoned building. The defendant showed her a gun and told her to be quiet or he would kill her. The defendant undressed the victim and started touching the child's genital area. He released the child when he heard people outside looking for her. Dr. Schwartzenburg's testimony that there were three abrasions to the victim's exterior vaginal area and that one area fluoresced with the Woods Lamp indicated that the defendant attempted to have intercourse with the victim. The victim stated that she was eleven years old when the attack occurred. Such evidence is sufficient to support the defendant's conviction for attempted aggravated rape.
First degree robbery is the taking of anything of value belonging to another from the person of another, or that is in the immediate control of another, by use of force or intimidation, when the offender *597 leads the victim to reasonably believe he is armed with a dangerous weapon. La. R.S. 14:64.1. In the case at bar, B.W. testified that the defendant took her jewelry from her during the incident. She stated that the defendant told her he was armed. While she did not see the gun, she could feel it. The defendant searched B.W.'s book bag and the diaper bag. The defendant took her earrings, nameplate and chain. B.W.'s testimony was sufficient to support the defendant's conviction for first degree robbery.
La. R.S. 14:27 A defines attempt as:
Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
T.L. stated that as she attempted to pass the defendant, he grabbed her and stuck something hard in her side. She believed he was armed with a weapon. After the defendant raped her, he told her to give him whatever money or jewelry she had on her. However, she told him she did not have anything. T.L.'s testimony was sufficient to support defendant's conviction for attempted first degree robbery.
These assignments are without merit.

ASSIGNMENT OF ERROR NUMBER 4
The defendant contends that the trial court erred in denying his motion to suppress identification. The defendant contends that the photographic lineups presented to the victims were suggestive and unreliable.
When reviewing an out-of-court identification procedure for its constitutionality and its consequent admissibility, the court must first make a determination of whether the police used an impermissibly suggestive procedure in obtaining the out-of-court identification. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); State v. Prudholm, 446 So.2d 729 (La.1984); State v. Hankton, 96-1538 (La.App. 4 Cir. 9/16/98), 719 So.2d 546, writ den., 98-2624 (La.1/29/99), 736 So.2d 828; State v. Sterling, 96-1390 (La. App. 4 Cir. 11/13/96), 684 So.2d 74. If the court finds in the affirmative, the court must then decide, under all the circumstances, if the suggestive procedure gave rise to a substantial likelihood of irreparable misidentification. Manson, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140; Prudholm; Hankton; Sterling.
In Manson, the Supreme Court set forth a five-factor test to determine whether an identification is reliable: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. Hankton; Sterling. As noted by this court in Sterling: "The defendant bears the burden of proving that an out-of-court identification itself is suggestive, and that there was a likelihood of misidentification as a result of the identification procedure. [citations omitted] An identification procedure is unduly suggestive if it focuses attention on the defendant." Id. p. 3, 684 So.2d at 75.
The defendant contends that the photographic lineups shown to the victims were suggestive because he had a swollen eye in the photograph of him included in the lineups. The defendant also argues that the identifications by B.W. and T.L. were suggestive because each of them saw the defendant after his arrest and prior to their identifications. B.W. allegedly saw the defendant as he was being arrested on May 10, 1997. Defendant contends T.L. saw him on a television report concerning his arrest.
The only copies of the photographic lineup included in the appellate record are two *598 Xeroxed copies of the photographs used in the photographic lineup. Because these copies are of such poor quality, we cannot determine whether the defendant's eye is swollen shut in his photograph.
Regardless, even if the photographic lineup was suggestive, the identifications made by the victims were reliable. Each victim positively identified the defendant as the perpetrator. B.W. identified the defendant in a photographic lineup on May 13, 1997, approximately two and one half months after the incident. B.W. testified that she first noticed the defendant when he was walking in front of her on Benefit Street. She passed him when he stopped to tie his shoes. The defendant then came up behind her and told her he had a gun. He told the victim to walk with him. The defendant contends that since the perpetrator was behind the victim and there was not much lighting in the abandoned building, she did not get to see the perpetrator's face. However, the victim stated that she saw the defendant's face as she passed him on the street. In addition, the victim was face to face with the defendant while he raped her. There was sufficient time during the offense for the victim to view the defendant. Further, the victim assisted a sketch artist in making a composite sketch of the perpetrator. Detective Small stated that the defendant's appearance was very similar to the composite sketch. B.W. was positive of her identification of the defendant at trial and when she reviewed the photographic lineup.
T.G. also identified the defendant in a photographic lineup on May 13, 1997 as the person who kidnapped, raped and robbed her. The identification occurred approximately one month after the incident. T.G. testified that the defendant approached her as she was on a pay telephone. When she got off the telephone, the defendant hugged her. The defendant released the victim when the victim questioned his actions. Thereafter, T.G. stated that she and the defendant both got on the same public transit bus. When she got off the bus, the defendant approached her again. This time, he told her he had a weapon and forced her to walk with him. The defendant then took her to an abandoned building where he raped and robbed her. The victim testified that she had more than enough time to view the defendant, especially in light of the fact he approached her once before the attack and got on the same bus with her. T.G. also positively identified the defendant at trial as the perpetrator.
T.L. stated that she was walking on Pleasure Street when she noticed the defendant walking towards her. As she attempted to pass the defendant, he grabbed her. T.L. testified that she was face to face with the defendant at that point. The defendant directed her to walk with him. The defendant took her into an abandoned building where he raped her. Again, despite the defendant's contentions that the perpetrator was behind the victim, there is evidence to show that the victim was face to face with the defendant. T.L. stated that she looked him directly in the face. T.L. identified the defendant in a photographic lineup on May 13, 1997, only four days after he attacked her. T.L. testified at trial that she was positive of her identification of the defendant as the person who kidnapped, raped and attempted to rob her.
J.H. testified that, on May 10, 1997, the defendant grabbed her and took her into an abandoned building where he robbed and attempted to rape her. She stated that the defendant showed her his weapon and told her to be quiet. The incident occurred at approximately 5:00 p.m., so there was still daylight. The victim stated that she was able to get a good look at the defendant's face when he grabbed her and took her into the abandoned building. She identified the defendant in a photographic lineup shortly after the incident as the perpetrator. J.H. also identified the defendant at trial as the *599 person who kidnapped, robbed and attempted to rape her.
As stated above, the victims had more than adequate time to view the defendant during the offenses. Each of the victims noticed the defendant before he approached and grabbed them. They each stated that they were face to face with the defendant at least one time during the incidents. Thus, even assuming the lineups were suggestive, the victims' identifications were reliable. The trial court did not err when it denied the defendant's motion to suppress identifications.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 5
The defendant also suggests that his convictions for aggravated kidnapping and armed robbery of T.G. and J.H. violated his right against double jeopardy.
This issue was discussed in State v. Woods, 96-2650 (La.App. 4 Cir. 4/20/95), 654 So.2d 809, writ den., 95-1252 (La.6/30/95), 657 So.2d 1035, as follows:
Both the Louisiana and United States Constitutions prohibit placing a person twice in jeopardy of life or limb for the same offense. United States Constitution, Amendment 5; Louisiana Constitution of 1974, Art. 1, Sect. 15; see also C.Cr.P. art. 596. In Blockburger v. United States, 248 U.S. 299, 52 S.Ct. 180 (1932), the United States Supreme Court held that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not. This test was affirmed by the Court in United States v. Dixon, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993). Additionally, Louisiana applies the "same evidence" test, a "broader test" than the federal Blockburger test. State v. Steele, 387 So.2d 1175 (1980); State v. Roy Warner,[(La.App.4th Cir. 1995), 653 So.2d 57] supra; State v. Smith, 94-0621 (La.App.4 Cir. 12/15/94), 647 So.2d 1321; State v. Williams, 92-2080 (La. App. 4 Cir. 12/15/94), 647 So.2d 1244. In order for double jeopardy to occur, the evidence required to support a finding of guilt of one crime must also support conviction of the other, and a defendant can be placed in jeopardy for only one. The test depends on the evidence necessary for conviction, not all the evidence introduced at trial.
Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. La.R.S. 14:64.
La. R.S. 14:44 defines aggravated kidnapping as:
Aggravated kidnapping is the doing of any of the following acts with the intent to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender's actual or apparent control:
1) The forcible seizing and carrying of any person from one place or another; or
2) The enticing or persuading of any person to go from one place to another; or
3) The imprisoning or forcible secreting of any person.
In State v. Williams, 92-2080 (La.App. 4 Cir. 12/15/94), 647 So.2d 1244, this Court concluded that the defendant's convictions for attempted armed robbery and attempted aggravated kidnapping did not violate defendant's rights against double jeopardy. In that case, the evidence established that an attempted armed robbery occurred when defendant pulled his knife, placed it at the victim's throat and demanded cash. When the defendant forced the victim at knifepoint to the Canal Villere store to cash a check, that constituted aggravated kidnapping. Even though defendant was *600 convicted of the lesser included offense of attempted aggravated kidnapping, the element of "forcible seizing and carrying of any person from one place to another," was a necessary element of his conviction. Thus, the evidence used to convict defendant of attempted armed robbery when he demanded something of value at knifepoint would not be sufficient to support the attempted aggravated kidnapping conviction.
In the present case, the defendant's convictions for the armed robberies and aggravated kidnappings of T.G. and J.H. do not violate defendant's rights against double jeopardy. The defendant's conviction for the aggravated kidnapping of T.G. is based upon the evidence that the defendant grabbed the victim as she departed from a public transit bus, showed her a weapon and took her into an abandoned building. The defendant's conviction for armed robbery is based upon the evidence that the defendant, after raping the victim, took her jewelry while armed with a gun.
Likewise, defendant's conviction for the aggravated kidnapping of J.H. is based upon testimony that the defendant grabbed the victim as she was walking down the street with a friend. The defendant showed her a gun and told her to be quiet. He then led her into an empty building where he attempted to rape her. The defendant's conviction for armed robbery is based upon the fact that the defendant, while armed with a gun, took the victim's money and jewelry before he left the scene.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 6
The defendant also argues that the sentences imposed are unconstitutionally excessive.
Article 1, Section 20 of the Louisiana Constitution of 1974 provides that "No law shall subject any person ... to cruel, excessive or unusual punishment."
A sentence within the statutory limit is constitutionally excessive if it is "grossly out of proportion to the severity of the crime" or is "nothing more than the purposeless imposition of pain and suffering." State v. Caston, 477 So.2d 868 (La. App. 4th Cir.1985). Generally, a reviewing court must determine whether the trial judge adequately complied with the sentencing guidelines set forth in La.C.Cr.P. art. 894.1 and whether the sentence is warranted in light of the particular circumstances of the case. State v. Soco, 441 So.2d 719 (La.1983); State v. Quebedeaux, 424 So.2d 1009 (La.1982).
If adequate compliance with Article 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of his case, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged. State v. Quebedeaux, supra; State v. Guajardo, 428 So.2d 468 (La.1983).
Prior to sentencing the defendant, the trial court noted the defendant had one prior conviction for felony sexual assault and was a registered sexual offender from the State of Connecticut. The trial court recognized that two of the victims in the present case were minors, the youngest being eleven years of age. The trial court then went on to give its reasons for sentencing.
BY THE COURT:
Again, I show you what I have written and I allow each of you to traverse any of my comments or disagree with me.
What I'm about to say obviously has nothing to do what we're here about, and yet it has a lot to do with it because the message referred to something else but it truly strikes home here. When this all came to an end with the verdict of guilty on every count against each of the four young ladies, it's funny how one's mind works, especially mine perhaps. *601 I thought of August 9, 1974, and everyone in this room might be saying what's so significant about that. On that date Gerald Ford became the president of the United States, and in his famous line he said in welcoming the ladies and gentlemen of this country and thanking them, he said the long nightmare is over. Of course, what he was referring to was the Watergate crisis and the resignation of President Richard M. Nixon. But that quote stuck in my mind and it remains with me. Obviously, the President's remarks at that time were not referring to the series of events that these four young ladies unfortunately were so intimately involved in against their will. Yet, his words ring true for each of those four little girls, young ladies, teenagers, twenty-one year olds because what this man perpetrated upon them in the eyes of this Jury, regardless of their age, they could have been 55, 85, 65, but two of them were eleven years of age. Their innocence was wiped away on the day that you came into their lives but for a fleeting moment or two. You took away from them the opportunity to enjoy one of the most precious gifts that God Almighty has given to each of us. You can stand before this Court until you're blue in the face. The Jury heard what happened. The Jury heard how you were caught in the fourth incident with that little girl screaming for her life. The tapes on television alone showed your capture, running from that complex. Thank God for the people who came to the assistance of that little girl, in the case that ultimately led to your apprehension and your identification in the other cases. Those ladies, two little eleven year old girls, as well as the older two, their minds were fixed on this incident. They knew who had done this to them and God gave them the courage, the strength to come into this room and look you right in the eye, with twelve citizens looking at them from the side to my left, and from people in this audience, totally strangers to each of them, pointing you out nonetheless and relaying and repeating and reliving this horrible episode.
Mr. Ballett, whether or not you are one and same Mr. Ballett who originally was in Hartford, Connecticut and perpetrated a strikingly similar crime on a child, is of no moment because my remarks are the same. But it appears very much from what the State has presented this morning, that you are one and the same. You're not being multiple billed but that cannot be considered just a passing comment. Between the State of Connecticut and this state you have now jeopardized the lives of five young people, three of them actually children in every sense of the word. Any court of appeal that needs to look at this record, I believe, will see immediately the nature of these offenses and what has been perpetrated on each of these young children. I'll never forget those children and I'll never forget you. I commend your attorney, as he always does in a professional manner, did everything he could to represent you professionally and ethically. But with all respect to Mr. Hurtt, and I'm not here to defend him, I don't know that any attorney or group of attorneys could have overcome the evidence so convincing that was presented by the state of Louisiana in this case. With all respect to the police and the other citizens who came to the aid of these ladies, it was the four ladies who in my opinion ultimately made the case, as we sometimes say. They truly were the star witnesses. I find that what you have perpetrated on them is unforgivable. It's rare that I'll ever say that because we're always taught to forgive. Because what you took away from them can never be brought back. It can never be replaced. If you shoot me in the chest, and we hear so often how doctors at Charity Hospital we hear it every day, a doctor is going to be here on Monday, and we anticipate how he's going *602 to talk about how he saved, literally saved, and I don't want to be overly dramatic the life of a little child two years old. But what you took from each of those four children can never be stitched up. No organ transplant can ever replace what you took from each of them. That, to me, is the ultimate crime. How can you live with yourself each day and how you deal with this, I cannot begin to comprehend. I would like the Pardon Board and any future governor of this state to know that as far as I'm concerned, that this man should die in prison. Absent any appellate court reversing his conviction and the state not obtaining the convictions again, or some future governor or the present governor seeing fit, and I hope that they never do, to release this man, you shall die in the custody of the Department of Corrections for the State of Louisiana unless you escape.
In the present case, the trial court imposed the maximum sentence on each conviction. The defendant contends that such sentences are excessive and not warranted if each case is taken separately. He suggests that the trial court should have considered that while each victim was sexually assaulted, none of them were otherwise harmed. They were not beaten and were told from the outset that they would be let go. Defendant further states that the items taken were small  "some change and a couple of items of jewelry."
The trial court is entitled to consider the defendant's entire criminal history in determining the appropriate sentence to be imposed. At the sentencing hearing, the trial court recognized the defendant had a prior conviction for sexually molesting a minor and was a registered sexual offender. The trial court correctly considered the multiple nature of the offenses of which the defendant was charged and convicted in the present case. The defendant was charged and convicted of thirteen separate felonies. The defendant conducted a reign of terror on four young girls. In each situation, he abducted the victim, took her into an abandoned building, raped and/or attempted to rape her, and then took whatever valuables she may have had. In one case, the victim was under twelve years of age. In another case, he kidnapped and raped a young girl who was carrying her two-year-old niece. In fact, the victim in that situation testified that the defendant raped her while she was holding her niece. The trial court correctly concluded that the defendant was one of the worst type of offenders and did not err when it imposed the maximum sentences on the defendant.
This assignment is without merit.
Accordingly, for the above reasons, the defendant's convictions are affirmed. The defendant's sentences on counts one through twelve are affirmed. His sentence on count thirteen is vacated and the case is remanded for resentencing on this count only.
CONVICTIONS AFFIRMED; SENTENCES ON COUNTS ONE THROUGH TWELVE AFFIRMED; SENTENCE ON COUNT THIRTEEN VACATED AND CASE REMANDED FOR RESENTENCING.
NOTES
[1] Due to the sensitive nature of the facts of the case, the victims' initials are used in lieu of their full names in the opinion.